# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| MICHELLE GRUESBECK, individually and as the representative of a class of similarly-situated persons,<br><br>*Plaintiff,*<br><br>v.<br><br>BATCHSERVICE LLC d/b/a BATCHDATA, a Delaware Limited Liability Company,<br><br>and<br><br>EQUIMINE INC. d/b/a PROPSTREAM, a California Corporation,<br><br>*Defendants.* | Case No. 1:26-cv-00808-WJM-KAS<br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

Plaintiff Michelle Gruesbeck ("Plaintiff"), by and through her attorneys, brings this Class Action Complaint on behalf of herself and all other persons similarly situated and alleges the following against Defendants BatchService LLC d/b/a BatchData ("BatchService") and Equimine Inc. d/b/a PropStream ("Equimine") (collectively, "Defendants"):

## NATURE OF THE ACTION

1. Plaintiff and members of the proposed class (the "Class" or "Class Members") seek statutory damages, an injunction, and other relief from BatchService and Equimine for violations of the Colorado Prevention of Telemarketing Fraud Act ("PTFA"), Colo. Rev. Stat. § 6-1-304.

2.      On May 27, 2005, HB05-1288[1] was signed into law, amending PTFA to prohibit listing a cellular telephone number in a directory for a commercial purpose without affirmative consent. *See* Colo. Rev. Stat. § 6-1-304(4)(a)(I).[2] The amendment took effect on September 1, 2005. *Id*.

3.      This amendment to PTFA was designed to protect the privacy of cellular telephone numbers, as demonstrated by former Colorado State Representative Mark Cloer's public comments on the provision: "Most people view their cell phones as private. They give out the number to friends and family and some colleagues. When their cell phone rings, they expect it to be important. Most users would find a sales call to be an intrusion . . . ."[3]

4.      The Colorado legislature enacted subsection (4) of PTFA to specifically address privacy concerns of cellular telephone users and protect cellular telephone users from the misappropriation of their personal information, in keeping with the overall purpose of PTFA:

> The general assembly hereby finds, determines, and declares that the use of telephones for commercial solicitation is rapidly increasing; that this form of communication offers unique benefits, but entails special risks and poses the potential for abuse; that the general assembly finds that the widespread practice of fraudulent and deceptive commercial telephone solicitation has caused substantial financial losses to thousands of consumers, and, particularly, elderly,

---

[1] Colorado House Bill 05-1288, Final Act, https://www.leg.state.co.us/clics2005a/csl.nsf/fsbillcont3/1BB0D3E00348AC6987256F90007C20C7?open&file=1288_enr.pdf.

[2] Colorado House Committee on Business Affairs and Labor, Bill Summary for HB05-1288, https://www.leg.state.co.us/CLICS2005A/commsumm.nsf/IndSumm/574E34C489356ADA87256FB100612E60?.

[3] 9News, "Legislative Library: Feb. 23, 2005," https://www.9news.com/article/news/local/politics/legislative-library-feb-23-2005/73-344789916.

homebound, and otherwise vulnerable consumers, and is a matter vitally affecting the public interest; and, therefore, that the general welfare of the public and the protection of the integrity of the telemarketing industry requires statutory regulation of the commercial use of telephones.

Colo. Rev. Stat. § 6-1-301.

5.      Colo. Rev. Stat. § 6-1-304(4)(a) thus provides: "On or after September 1, 2005, a person commits an unlawful telemarketing practice if the person knowingly: (I) Lists a cellular telephone number in a directory for a commercial purpose unless the person whose number has been listed has given affirmative consent, through written, oral, or electronic means, to such listing . . . ."

6.      Defendants provide software for various real estate professionals such as real estate investors, agents, and mortgage lenders. One of Defendants' products is BatchLeads, an online platform that enables users to "identify and engage property owners" by gathering and making searchable in a directory from the personal information of property owners, including a property owner's full name, address, the property's purchase date and price, and, most pertinent here, cellular telephone number.[4] This information enables users to accurately identify individual property owners contained on the BatchLeads platform, many of whom reside in Colorado. Defendants maintain that BatchLeads provides users with the "data, tools, and insights you need to generate targeted leads, connect with property owners, and close more deals."[5]

---

[4] Information from Defendants' website, batchleads.io, last visited on May 6, 2026.

[5] *Id.*

7.    Defendants provide access to their directory for a subscription fee and use the directory for marketing subscription sales. In other words, Defendants use their directory, and the lists of cellular telephone numbers contained therein, for commercial purposes.

8.    Plaintiff and the Class have no relationship with Defendants. More importantly, Plaintiff and the Class never provided Defendants with affirmative consent to list their cellular telephone numbers in Defendants' directory.

9.    Despite failing to obtain affirmative consent from Plaintiff and the Class, Defendants nevertheless listed their cellular telephone numbers in their directory for commercial purposes in violation of PTFA.

10.    Plaintiff brings this action seeking an order (i) declaring that Defendants conduct violates PTFA, (ii) requiring that Defendants cease the unlawful activities described herein; (iii) awarding Plaintiff and the Class statutory damages in the amount of at least $300 and not more than $500; and (iv) reasonable attorneys' and costs.

## PARTIES

11.    Plaintiff Michelle Gruesbeck is, and at all times relevant to this action has been, a citizen of Colorado residing in Alma, Colorado.

12.    Defendant BatchService is a Delaware limited liability company with its principal place of business located in Tempe, Arizona. Over the past three years, BatchService has knowingly and deliberately listed, and still currently lists, cellular telephone numbers together with associated identifying information in a database accessible and searchable through the BatchLeads online platform. Included in the

database are the cellular telephone numbers of Plaintiff and thousands of other Coloradans.

13.     Defendant Equimine is a California corporation with its principal place of business located in Lake Forest, California. On July 7, 2025, Equimine announced its acquisition of BatchLeads and BatchDialer, a premier AI-powered lead generation and marketing platform for real estate professionals and investors. Since at least July 7, 2025, Equimine has knowingly and deliberately listed, and currently lists, cellular telephone numbers together with associated identifying information in a database accessible and searchable through its BatchLeads online platform. Included in the database are the cellular telephone numbers of Plaintiff and thousands of other Coloradans.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action in which the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs; there are over 100 members in the putative class; and at least one Plaintiff is a citizen of a different state than at least one Defendant, satisfying CAFA's minimum diversity requirement.

15.     This Court has personal jurisdiction over Defendants because Defendants regularly transact business in Colorado and a substantial part of the events giving rise to the claims asserted herein occurred in Colorado. Defendants' wrongful conduct— knowingly listing the cellular telephone numbers of thousands of Coloradans in their directory, including Plaintiff, without requesting or receiving those individuals' affirmative

consent—caused injury in Colorado and to Colorado residents.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants conduct significant business transactions within this District and because the wrongful conduct giving rise to this action occurred in and was directed to this District. Venue is additionally proper because Plaintiff resides in Alma, Colorado, which is located within this District.

## FACTUAL ALLEGATIONS

### Defendants' Directory

17.     BatchService is a real estate software company that offers solutions for property management and investment management. BatchService functions as a data broker, aggregating property, mortgage, transaction, and owner contact information, including cellular telephone numbers, from public records and other sources, and lists that information in its database.

18.     BatchService's database is accessible through its online platform, BatchLeads, which requires paid subscriptions to utilize.

19.     Equimine is a "real estate data and analytics platform." On July 7, 2025, it announced the acquisition of BatchLeads, noting that as a result of the acquisition "[u]sers of both PropStream and BatchLeads will gain access to best-in-class nationwide data intelligence, enhanced lead targeting and a unified outreach platform via voice, email and direct mail, all under one roof."[6]

---

[6] Information from Equimine's website at https://www.propstream.com/news, last visited on May 6, 2026.

20.    Equimine is registered as a data broker with the California Privacy Protection Agency, reflecting the commercial nature of its data-related activities. Through this registration, Equimine acknowledges that it gathers personal information about consumers with whom it has no direct relationship and engages in the sale or licensing of such information for commercial purposes.

21.    Equimine's acquisition of BatchLeads did not end BatchService's involvement with the platform. According to the press release regarding the acquisition, "A key outcome of this strategic alignment is that Propstream [Equimine] is now one of BatchData's [BatchService] largest customers, powering the majority of the data Propstream [Equimine] serves to its customers."[7] Thus, BatchService is still integral to the BatchLeads platform and database, contributing to the platform's operations and commercial success.

22.    Defendants market BatchLeads as the "most complete property & homeowner database nationwide," with more than 300 million "people profiles" and more than "260 million phone numbers."[8]

23.    Through the BatchLeads website, Defendants acknowledge that their database is comprised of data from a wide variety of sources. According to the website, "[o]ur in-house data science team combines dozens of tier 1 data providers, public

---

[7] Press release, Digital Journal, "PropStream, a Stewart Information Services Corporation (NYSE:STC) company, Acquires BatchLeads and BatchDialer Products to Expand Their Technology Offerings; BatchData Sharpens Focus on APIs Powering (July 8, 2025) https://www.digitaljournal.com/pr/news/binary-news-network/propstream-stewart-information-services-corporation-1358974786.html.

[8] BatchLeads, *Dialer AI*, https://batchleads.io/dialer-ai, last visited on May 6, 2026.

records, and proprietary research and aggregation technologies to provide the most accurate and up-to-date property and property owner information possible. We are connected directly to USPS servers, and we conduct vacancy checks monthly. Our database is updated daily and continually validated through feedback loops across our BatchService product portfolio."[9]  In addition, the website states that "BatchLeads has a proprietary verification process that increases accuracy by confirming, cleaning, and adding data. This means that the data isn't just detailed, it's also reliable."[10]

24.    BatchLeads enables users to search for properties listed in Defendants' database by entering a location and utilizing a searchable map. Upon selecting a property address, Defendants display a comprehensive personal profile of the property owner, including fields for the owner's full name, cellular telephone numbers, email addresses, income, net worth, discretionary income, household size, gender, marital status, parental status, smoking status, pet ownership, vehicle ownership, and age.

25.    Information accessible on the BatchLeads platform is stored in an electronic database owned and maintained by Defendants. The inclusion of this information in their databases demonstrates that Defendants knowingly collected, used, and/or held out this information, including the cellular telephone numbers of Plaintiff and Class Members, to users of the platform. Indeed, as data brokers, Defendants, by necessity, know that they

---

[9] BatchLeads, Frequently Asked Questions, https://batchleads.io/faq, last visited on May 6, 2026.

[10] BatchLeads, "Generating Leads in Real Estate Starts with Quality Data," BatchLeads Blog (Aug. 31, 2022), https://batchleads.io/blog/generating-leads-in-real-estate-starts-with-quality-data, last visited on May 6, 2026.

are collecting and utilizing Plaintiff's and Class Members' information listed in their database.

26.     The BatchLeads platform is geared toward real estate professionals, with the stated goals of generating leads, enabling connections with property owners, and assisting in the completion of real estate deals for subscribers to the platform.[11] The breadth and sensitivity of the personal information Defendants compile and display, including personal attributes and detailed financial profiles (*see supra* ¶24), render the platform equally suited to broader commercial targeting, harassment, stalking, and other harms to Colorado residents.

27.     A key feature in BatchLeads is "My Lists." When users "save" a property or a group of properties based on selected criteria, BatchLeads populates a list accessible to the user with owners' personal information, including their names, addresses, and phone numbers. Critically, the "My Lists" feature enables users to compile property owner profiles across cities, counties, zip codes, and states simultaneously. Defendants' own platform tutorial demonstrates the capability of pulling targeted lists of property owners across an entire city—using the city of Phoenix as an example—filtered through demographic characteristics, including the age of the owners, their household size, their income, and whether they have children in the home.[12]

28.     These lists enable users to collect and use cellular telephone numbers in

---

[11] batchleads.io, last visited on May 6, 2026.

[12] BatchLeads, Complete Guide for BatchLeads 2024, https://batchleads.io/batch-tv/mastering-batchleads/complete-guide-for-batchleads-2024, last visited on May 6, 2026.

9

high volumes for real estate solicitation. Users can select entries in a list, "export" them, as well as "add" them to BatchDialer, an application offered by Defendants that enables high volume calling.

29.    BatchDialer enables users to call three people at once, rotate through a users' lists of telephone numbers for property owners, and provides an "AI guided script" for answered calls.[13]  BatchDialer provides users with a selection of telephone numbers for call origination that automatically match the area code of the call recipient, increasing the likelihood of calls getting answered and avoiding users' telephone numbers being labeled as "spam."[14] To this end, "[e]very BatchDialer plan includes built-in phone number reputation monitoring to detect carrier flags and spam risks. With optional automatic number replacement, you'll always be dialing from clean numbers—so more of your calls get answered."[15]

30.    As discussed above, phone numbers are a central pillar of BatchLeads, and the website includes guides on "preparing to cold call." The website encourages users to overcome inhibitions with respect to cold calling, noting that "as you follow these scripts, you'll realize it's easier than you thought." "Soon, [Defendants claim], you'll forget that you were ever nervous to call in the first place!"[16]

---

[13] www.batchdialer.com, last visited on May 6, 2026.

[14] *Id*.

[15] *Id.*

[16] BatchLeads, *4 Real Estate Cold Calling Scripts To Increase Leads* https://batchleads.io/blog/4-real-estate-cold-calling-scripts-to-increase-leads, last visited on May 6, 2026.

31.     Furthermore, when users click an address on their list, they are presented with a property report, which includes an option to call the owner directly from the BatchLeads platform.

32.     Defendants offer a 7-day free trial of their BatchLeads platform. During the free trial, users are allowed access to Defendants' database, including identifying personal information of Coloradans as well as their cellular telephone numbers.

33.     The purpose behind Defendants providing users with a free 7-day BatchLeads account is to convince prospective customers to purchase subscriptions to BatchLeads. In other words, the free account serves as a preview of the BatchLeads platform and features the type of information available (such as cellular telephone numbers), forming part of a commercial strategy aimed at enticing users to commit to a monthly or yearly subscription. Thus, the cellular telephone numbers of Plaintiff and Colorado citizens are being used by Defendants for a commercial purpose.

34.     Moreover, Defendants' entire business model is based on selling access to the property owners listed in their directory to real estate professionals. To enhance the appeal of this access, which is paid for through subscription costs, Defendants include cellular telephone numbers of Coloradans and others with the property listings.

35.     Defendants have a commercial purpose in collecting and listing the cellular telephone numbers of Plaintiff and thousands of other Coloradans—both for free and under a paid subscription—either as advertising for their platform and directory or as a service exchanged for a paid subscription for use of the platform and access to the directory.

11

36.     Defendants' use of cellular numbers in this manner demonstrates that they have value. Defendants' business model is dependent on providing access to property owners, and cellular numbers are an essential component of that access. Indeed, Defendants' targeted subscribers, real estate professionals, pay subscription fees for this access.  Thus, Defendants derive value through the accumulation of cellular numbers for their BatchLeads platform by (i) charging subscribers a monthly or yearly fee for access to those numbers, and (ii) using the same numbers for marketing purposes.

37.     Despite listing Plaintiff's and other Class Members' cellular telephone numbers in their directory, and using those numbers for commercial purposes, Defendants never requested or obtained consent to do so.

**Defendants' Conduct Harms Coloradans**

38.     Defendants' misappropriation of Plaintiff's and thousands of other Coloradans' cellular telephone numbers deprives these individuals of the real, quantifiable value of their data, exposes them to heightened risks of fraud and invasion of privacy, and deprives them of their rights under PTFA.

39.     Coloradans regularly suffer abuse from parties who misuse cellular telephone numbers made available through data brokers like Defendants. For example, the Federal Trade Commission's FY2024 National Do Not Call Registry Data Book shows that Colorado ranks tenth among all states in complaints per state resident (41,173 complaints; 719 complaints per 100,000). The large majority of complaints from Colorado are complaints about robocalls, and the leading complaint topic reported by Coloradans

is "Imposters"—calls in which the caller fraudulently purports to be someone else.[17] According to one report, "Coloradans received 291.1 million scam or unwanted robocalls from January through September of [2025]."[18]

40.    In addition, the Colorado Governor's Office of Information and Technology has been warning Coloradans about "Smishing," which is "a form of social engineering that uses text messages (SMS) to trick you into giving up personal data or clicking on malicious links. The goal is usually to steal your passwords, credit card details or other sensitive information."[19] Defendants make "Smishing" attacks easier by making Coloradans' cell phone numbers and other personal information available for a price or as part of an advertising effort (*e.g.*, during the "free trial" period).

41.    There are additional harms inherent in having one's personal data misappropriated by online directories and data broker sites. Phone scams are one common example, in which scammers employ various methods to cheat people out of money by taking their payment information and other personal details over the phone. The FTC warns consumers about numerous categories of common phone scams, including: (1) impersonator scams that involve pretending to be a government agency or a loved one; (2) debt relief and credit repair scams, in which scammers offer to lower

---

[17] Fed. Trade Comm'n, The National Do Not Call Registry Data Book (Nov. 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/DNC-Data-Book-2024.pdf.

[18] *Spam robocalls hit 6-year high as fewer phone companies protect us*, CoPIRG Found. (Oct. 16, 2025), https://pirg.org/colorado/foundation/media-center/spam-robocalls-hit-6-year-high-as-fewer-phone-companies-protect-us/.

[19] Governor's Office of Information Technology, Have You Been Smished? (Nov. 7, 2024), https://oit.colorado.gov/blog-post/have-you-been-smished.

credit card interest rates, fix credit scores, or forgive student loans; (3) business and investment scams, in which scammers promise to help individuals start their own businesses or guarantee profits from investments; (4) charity scams, in which scammers pose as real charities and ask for fraudulent donations for disaster relief or local law enforcement; (5) extended car warranty scams; (6) "free trial" scams; (7) loan scams; (8) prize and lottery scams; and (9) travel scams and timeshare scams.[20]

42.    Scams and the misappropriation of personal data extracted from the Internet have been directly linked to people search sites and directories like the one maintained by Defendants.[21]    And beyond financial scams, the misappropriation of personal data and contact information can even potentially increase the risk of victimization by stalkers and perpetrators of domestic violence and other forms of abuse.[22]

43.    A Federal Trade Commission ("FTC") report on Data Brokers succinctly outlines the many risks inherent in misappropriating personal information of consumers, as Defendants have done here:

---

[20] FTC Consumer Advice, "Phone Scams," https://consumer.ftc.gov/articles/phone-scams.

[21] *See, e.g.*, Consumer Reports, "Evaluating People-Search Site Removal Services," https://innovation.consumerreports.org/Data-Defense_-Evaluating-People-Search-Site-Removal-Services-.pdf ("People-search sites put ordinary people at risk of fraud, identity theft, scams, and even stalking and other forms of harassment.");  Fox News, "The dangerous intersection of people search sites and scams," https://www.foxnews.com/tech/dangerous-intersection-people-search-sites-scams (outlining how people search sites can enable scammers to find victims, create detailed profiles of individuals, and launch targeted phishing attacks to probe for sensitive information).

[22] *See, e.g.*, Voices of Women, "The Dangers of People Search Sites," https://vownow.org/2020/10/the-dangers-of-people-search-sites/; FTC, "Data Brokers: A Call for Transparency and Accountability," https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf.

> There are a number of potential risks to consumers from data brokers' collection and use of consumer data. … [T]hey may facilitate the sending of advertisements … which some consumers may find troubling and which could undermine their trust in the marketplace. Moreover, … people search products can be used to facilitate harassment, or even stalking, and may expose domestic violence victims, law enforcement officers, prosecutors, public officials, or other individuals to retaliation or other harm.[23]

44.    The harms described above are exacerbated by the growing technical capabilities of criminals who have developed the ability to contact cellular telephone numbers on an unprecedented scale. In recent years, criminal operators have deployed so-called "SIM farms"—large collections of centrally managed SIM cards housed in SIM boxes and controlled by servers—to carry out high-volume spam, fraud, and other attacks that directly harm individuals. By way of example, the U.S. Secret Service recently identified a New York-area operation that a law enforcement source reported "could be used to send approximately 30 million text messages per minute, meaning it could anonymously text the entire United States in around 12 minutes."[24]

45.    Access to cellular telephone numbers in conjunction with other personally identifying information enables devastating forms of fraud. One serious emerging threat is "SIM swapping," in which criminal actors impersonate a victim to trick a mobile carrier into transferring the victim's telephone number to a SIM card controlled by the attacker.

---

[23] FTC, "Data Brokers: A Call for Transparency and Accountability," https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf.

[24] Andy Greenberg, Lily Hay Newman & Matt Burgess, " 'SIM Farms' Are a Spam Plague. A Giant One in New York Threatened U.S. Infrastructure, Feds Say," WIRED (Sept. 23, 2025), https://www.wired.com/story/sim-farm-new-york-threatened-us-infrastructure-feds-say/.

Once the SIM is reassigned, the attacker receives the victim's calls and text messages and can intercept one-time passcodes or account-recovery messages sent via SMS. Since many online services reply on SMS-based authentication or password-reset links, a successful SIM-swap enables attackers to bypass those protections and take control of email, financial, and other online accounts, causing significant financial loss and invasion of privacy.[25] SIM swapping is only possible when criminals obtain information regarding victims' cell phone numbers and other personal information through services like BatchLeads.

### Plaintiff's Experience

46.    Plaintiff is a citizen and resident of Colorado and maintains a cellular telephone number.

47.    As of December 2025, Defendants were displaying a listing for Plaintiff's property in the BatchLeads platform that included multiple telephone numbers, including her cellular telephone number, her full name, multiple email addresses, estimated household income, net worth, discretionary income, household size, and other personal information. For Plaintiff's cellular telephone number, the information provided includes the name of the carrier, that the number is on the National Do Not Call ("DNC") Registry, that the number is reachable, and that the number was tested.

---

[25] Fed. Bureau of Investigation, Internet Crime Complaint Ctr., Criminals Increasing SIM Swap Schemes to Steal Millions of Dollars from U.S. Public, Alert No. I-020822-PSA (Feb. 8, 2022), https://www.ic3.gov/PSA/2022/PSA220208.

48. Plaintiff's property report further displayed a 'Save to List' button enabling subscribers to add Plaintiff's cellular telephone number and personal information to lists that are created, stored, and maintained by Defendants within the BatchLeads platform. This makes Plaintiff's cellular number and personal information accessible to a subscriber on an ongoing basis for targeting, follow-up campaigns, and outbound calling. Upon information and belief, Plaintiff's personal information can be added to these lists in a bulk addition, without any individual selection of Plaintiff's property.

49. On information and belief, Plaintiff's cellular number was contained in BatchService's database and accessible on the platform before Equimine's acquisition of BatchLeads on July 7, 2025.

50. Defendants use access to Plaintiff's property report and personal identifying information, which includes her cellular telephone number, to charge users of their platform for access to their database and also for advertising purposes. In other words, Plaintiff's cellular number was held out by Defendants for commercial purposes.

51. Defendants knowingly listed Plaintiff's cellular telephone number in their database. Indeed, as discussed above, the number is listed as a mobile number on the BatchLeads platform and identified as tested, reachable, and on the National DNC Registry.

52. Plaintiff does not subscribe for access to Defendants' directory. In fact, Plaintiff has no relationship with Defendants whatsoever.

53. Defendants never requested—and Plaintiff never provided—affirmative consent to the listing of her cellular telephone number by Defendants in their directory, by

written, oral, electronic, or other means.

54.     Plaintiff had no reasonable ability to discover Defendants' use of her cellular telephone number until shortly before filing the present action.

55.     Plaintiff has privacy and property interests in her cellular telephone number. Plaintiff has the right to exclude companies like Defendants from using or taking advantage of these interests without her consent.

56.     Defendants' knowing and deliberate use of Plaintiff's cellular telephone number for advertising and enhancing the value of their platform is misleading in that it gives the false impression that Plaintiff is a willing participant in the platform, which she is not, and that she wants to receive unsolicited communications from real estate professionals, marketers, and business development representatives, which she does not.

57.     Defendants' use of Plaintiff's cellular number in this manner demonstrates that it has value. Defendants' business model is dependent on providing access to property owners, and cellular numbers are an essential component of that access. Defendants derive value through the accumulation of cellular numbers, including Plaintiff's cellular number, for their BatchLeads platform by (i) charging subscribers a monthly or yearly fee for access to those numbers, and (ii) using the same numbers for marketing purposes.

58.     Defendants injured Plaintiff by knowingly using her cellular telephone number for their own commercial purposes without consent, the very harm PTFA was meant to prevent.

## CLASS ALLEGATIONS

59.     Plaintiff brings this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and a class of similarly situated individuals (the "Class" or "Class Members"), defined as follows:

> All persons who were Colorado residents within three (3) years prior to the filing of this complaint whose cellular telephone numbers were listed by Defendants in their for-profit directory.

60.     The following people are excluded from the Class: (i) any Judge presiding over this action and members of his or her family; (ii) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendants' counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

61.     Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the action.

62.     ***Numerosity* (Fed. R. Civ. P. 23(a)(1)).** Members of the Class are so numerous that joinder of all Class Members is impractical. Based on refined searches conducted on Defendants' directory, the number of persons in the class is estimated to be in the thousands. Additionally, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.

19

63.    *Commonality* **(Fed. R. Civ. P. 23(a)(2))**. A well-defined community of interest exists in the questions of law and fact involved in this action. Questions of law and fact common to the members of the Class that predominate over questions affecting only individual Class Members include, but are not limited to, the following:

(a)    Whether Defendants violated Colo. Rev. Stat. § 6-1-304(a)(I); and

(b)    Whether Plaintiff and Class Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of the suit, pursuant to Colo. Rev. Stat. § 6-1-305(1)(c).

64.    *Typicality* **(Fed. R. Civ. P. 23(a)(3)).** Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, had her cellular telephone number collected and listed on Defendants' directory for commercial purposes; Defendants collected and listed Plaintiff's cellular telephone number on the directory without Plaintiff's affirmative consent (either written, oral, electronic, or by other means); and Defendants' misappropriation of Plaintiff's personal data (including its economic value) was at the expense of Plaintiff's PTFA privacy rights.

65.    *Adequacy* **(Fed. R. Civ. P. 23(a)(4)).** Plaintiff will adequately safeguard the interests of the Class Members, as Plaintiff's interests align with, and do not conflict with those of the Class. Plaintiff's counsel has experience in handling class action litigation, including consumer privacy and statutory violations related thereto. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

66.    *Injunctive and/or Declaratory Relief* (**Fed. R. Civ. P. 23(b)(2)).** As demonstrated above, Defendants have acted on grounds generally applicable to the proposed Class such that declaratory and final injunctive relief are appropriate with respect to the Class.

67.    *Predominance and Superiority* (**Fed. R. Civ. P. 23(b)(3)).** Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other methods for the fair and efficient adjudication of the controversy because:

(a)  Proof of Defendants' liability on Plaintiff's claim will also prove liability for the claims of the Class without the need for individualized proceedings;

(b)  Evidence regarding defenses or any exceptions to liability that Defendants may assert and attempt to prove will come from Defendants' records and will not require individualized or separate inquiries or proceedings;

(c)  Defendants have acted and are continuing to act pursuant to common policies or practices in the same or similar manner with respect to all Class Members;

(d)  The injury suffered by each Class Member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system. A class action, on the other hand,

will permit a large number of claims involving virtually identical facts and legal issues to be resolved efficiently in one proceeding based upon common proofs without the risk of inconsistent judgments;

(e)     This case is inherently manageable as a class action in that: (i) Defendants' records will enable Plaintiff to readily identify Class Members and establish liability and damages; (ii) liability and damages can be established for Plaintiff and the Class with the same common proofs; (iii) a class action will result in an orderly and expeditious administration of claims, fostering economies of time, effort, and expense; (iv) a class action will contribute to uniformity of decisions concerning Defendants' practices; and (v) as a practical matter, the claims of each Class Member are likely to go unaddressed absent class certification.

## CAUSE OF ACTION

**Violation of the Prevention of Telemarketing Fraud Act**
**(Colo. Rev. Stat. § 6-1-304(4)(a)(I))**
**(On Behalf of Plaintiff and the Class)**

68.     Plaintiff incorporates the above paragraphs by reference as if fully stated herein.

69.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendants.

70.     Colo. Rev. Stat. § 6-1-304(4) provides:

(a)     On or after September 1, 2005, a person commits an unlawful telemarketing practice if the person knowingly:

(I)  Lists a cellular telephone number in a directory for a commercial purpose unless the person whose number has been listed has given affirmative consent, through written, oral, or electronic means, to such listing[.]

71.  Defendants knowingly listed Plaintiff's and other Coloradans' cell phone numbers in their directory.

72.  Defendants' BatchLeads platform is a directory. A "directory," according to Oxford Learner's Dictionaries, is a "book or electronic resource containing lists of information . . . for example people's phone numbers or the names and addresses of businesses in a particular area."[26] On their website, Defendants explicitly state that users can "[c]urate lead lists complete with owner email and phone numbers." The platform is a "directory," as it is a resource containing a list of information that includes individuals' cellular telephone numbers, among other personal details.

73.  Defendants list Plaintiff's and Class Members' cellular telephone numbers in their directory for two distinct commercial purposes: first, as part of a marketing plan during the free trial to entice potential customers to enter into subscriptions for access to their directory; and second, as part of the product it provides access to users for a cost.

74.  Defendants never requested and Plaintiff and other Class Members never provided "affirmative consent, through written, oral, or electronic means" to list their cellular telephone numbers in Defendants' directory. Colo. Rev. Stat. § 6-1-304(4)(a)(I).

---

[26] Oxford Learner's Dictionaries, "Directory,"
https://www.oxfordlearnersdictionaries.com/definition/english/directory; *see also* Cambridge, "Directory," https://dictionary.cambridge.org/us/dictionary/english-italian/directory#google_vignette (defining a "directory" as "a book or list of names and numbers").

Rather, Defendants routinely list the cellular telephone numbers of Coloradans they have never engaged with, have had no connection or relationship to, and who are completely unaware of Defendants.

75.    Defendants' misappropriation of Plaintiff's and Class Members' personal data (including its economic value) comes at the expense of Plaintiff's and Class Members' rights under PTFA. Defendants' conduct deprived Plaintiff and Class Members of the real, quantifiable value of their data, and it exposed Plaintiff and Class Members to elevated risks of harassment, stalking, scams, identity theft, and unwanted telemarketing calls.

76.    Thus, on behalf of herself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class; (iii) damages, pursuant to Colo. Rev. Stat. § 6-1-305(1)(c), of at least three hundred dollars ($300) and not more than five hundred dollars ($500) for each first offense, and at least five hundred dollars ($500) and not more than one thousand dollars ($1,000) for each second or subsequent offense; and (iv) reasonable attorneys' fees and other litigation costs pursuant to Colo. Rev. Stat. § 6-1-305(1)(c).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and the proposed Class, respectfully requests that this Court grant judgment against Defendants as follows:

(a)    An order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

24

(b)    An order declaring that Defendants' conduct, as described above, violates Colo. Rev. Stat. § 6-1-304(4)(a)(I);

(c)    An order awarding Plaintiff and Class Members statutory damages pursuant to Colo. Rev. Stat. § 6-1-305(1)(c), of at least three hundred dollars ($300) and not more than five hundred dollars ($500) for each first offense, and at least five hundred dollars ($500) and not more than one thousand dollars ($1,000) for each second or subsequent offense;

(d)    An order awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class, including *inter alia*, an Order requiring Defendants to comply with PTFA;

(e)    An order awarding Plaintiff and the Class their reasonable attorney's fees and expenses and costs of suit pursuant to Colo. Rev. Stat. § 6-1-305(1)(c);

(f)    An order awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

(g)    An order awarding such other and/or further relief as the Court may deem just and proper.

Dated: May 7, 2026

Respectfully submitted,

Michelle Gruesbeck, individually and as the representative of a class of similarly-situated persons,


/s/ Patrick J. Solberg
Patrick J. Solberg
Brian J. Wanca
Wallace C. Solberg
ANDERSON + WANCA
3701 Algonquin Road
Suite 500
Rolling Meadows, IL  60008
psolberg@andersonwanca.com
bwanca@andersonwanca.com
wsolberg@andersonwanca.com


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 7, 2026, a true and correct copy of the foregoing Notice of Appearance was e-filed and served on all counsel of record using the Court's CM/ECF system.


/s/ Patrick J. Solberg